UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

SCHUTTE BAGCLOSURES INC.,

                      Plaintiff,              12-cv-5541 (JGK)

          - against -                         OPINION AND ORDER

KWIK LOK CORPORATION,

                      Defendant.

─────────────────────────────────────────────

KWIK LOK CORPORATION,

              Counterclaim Plaintiff

          - against -

SCHUTTE BAGCLOSURES, INC., and
SCHUTTE BAGCLOSURES B.V.,

              Counterclaim Defendants.

─────────────────────────────────────────────

JOHN G. KOELTL, District Judge:

     This case is about small plastic closures that are used to
close bags of pastries, bread, and fruit. Kwik Lok Corporation
("Kwik Lok"), a manufacturer of bag closures, has had a long and
successful history in the bag closure industry in the United
States. Schutte Bagclosures, Inc. ("Schutte, Inc."), an American
subsidiary of Schutte Bagclosures B.V. ("Schutte B.V."), a Dutch
company that has sold similar plastic closures in Europe, is
interested in entering the bag closure market in the United
States and brought this action, seeking a declaration that its
products, known as Clipps G, do not infringe Kwik Lok's

intellectual property in the Kwik Lok bag closures. In addition to a declaration of non-infringement, Schutte, Inc., seeks a declaration of non-dilution, a declaration of invalidity, and order of cancellation of Kwik Lok's U.S. Trademark Registration No. 1,972,043 ("'043 Registration") pursuant to 15 U.S.C. § 1119.

In response, Kwik Lok filed counterclaims alleging that Schutte, Inc. and its corporate parent Schutte B.V. (referred to collectively as "Schutte") infringed Kwik Lok's exclusive trade dress rights which are protected under the '043 Registration as well as unregistered trade dress rights. Kwik Lok brought claims under the Lanham Act for trade dress infringement, unfair competition, and trade dress dilution, see 15 U.S.C. §§ 1114(1), 1125(a), 1125(c)(1), as well as state law claims for common law unfair competition and injury to business reputation under New York General Business Law § 360-1. The parties asserted several other claims and defenses that they voluntarily withdrew before proceeding to trial. See generally Schutte Bagclosures Inc. v. Kwik Lok Corp., 48 F. Supp. 3d 675 (S.D.N.Y. 2014).

Based on the Findings of Fact and Conclusions of Law set forth below, judgment is entered in favor of Schutte B.V. and Schutte, Inc. The Kwik Lok '043 Registration and related Product Configurations are functional because the features of the asserted trade dress configurations "affect[] the cost or

quality of the article." TrafFix Devices v. Mktg. Displays, 532
U.S. 23, 32 (2001) (internal citation omitted). The products'
shape affects how the closures are produced, stored, and how the
closures work in bag closing machines. The products'
configuration affects how efficiently the closure serves its
purpose of closing bags for various forms of merchandise.
Permitting Kwik Lok to maintain property rights in the closure
design would negatively impact the competition that the
functionality doctrine aims to protect. See id. at 29; Sweet St.
Desserts, Inc. v. Chudleigh's Ltd., 69 F. Supp. 3d 530, 533
(E.D. Pa. 2014), appeal filed, (3d Cir. Mar. 4, 2015).[1]

## I.    BACKGROUND

The main legal issue in this case is whether Kwik Lok can
assert trade dress protection in the design of certain bag
closure products. Schutte argued at trial that the shape of Kwik
Lok's bag closure products that are covered by the '043
Registration and similar designs are functional and is not
entitled to trade dress protection. The scope of the '043
Registration and whether the Registration covers Kwik Lok
plastic bag closure products with similar or identical features,

---

[1] The Court's decision will not deprive Kwik Lok of all proprietary rights in
the Kwik Lok products. Kwik Lok has a registered federal trademark for the
red Kwik Lok logo, No. 1,084,804, which is not at issue in this case.

is a threshold issue that determines the burden of proof on Schutte's functionality argument.

During a five-day bench trial, the parties presented the testimony of the following witnesses: Wout Abbenhuis, the chief executive of Schutte B.V.; Frank van Drunen, the technology and innovation manager for Schutte B.V.; Dr. Paul Koch, an expert in plastics engineering who explained the mechanical operation of the Kwik Lok bag-closing machine, how the forces of the machine affect a plastic closure, and his conclusions on the viability of alternative closure designs; the video testimony of Jerre H. Paxton, the President of Kwik Lok who is now deceased; Hal Miller, a former employee of Kwik Lok who served as the Vice President of Sales and testified about Kwik Lok's distribution channels and advertising practices; Roger Keith Hart, the chief engineer at Kwik Lok who testified about the development of the Kwik Lok closures; Professor Barton Beebe who testified about the procedures at the Patent and Trademark Office related to Kwik Lok's application for a trademark in the 1990s; Richard Miksanek, a retired distributor of Kwik Lok machinery and products who testified as an expert in the bag closure industry and who provided his views on the similarities between Kwik Lok's and Schutte's products and information about how Kwik Lok's products are sold and distributed; Cooper Woodring, an industrial product designer who developed alternative closure

4

designs and testified about the feasibility of production of these alternative designs. The parties also introduced numerous physical and documentary exhibits.

Having assessed the credibility of the witnesses and considered the evidentiary record, the Court makes the following Findings of Fact and reaches the following Conclusions of Law.

## II. FINDINGS OF FACT
### A.

1. The most common bag closures used by the food industry are wire-tie, tape, and the reusable plastic closures that are at issue in this litigation, which are most commonly used by bakeries. Paxton Dep. Vol. I at 86.

2. For more than 50 years, Kwik Lok has been a leading manufacturer, distributor, and seller of bag closure products. KL3 at KL0008020-22.

3. Kwik Lok is the only company in the United States that produces and sells re-usable sheet plastic closures that run through an automatic closing machine. Trial Transcript ("Tr.") 28, 305. Most bag closure products are applied in automated and semi-automated fashion by closing machines that are able to bag up to 6,600 bags per hour. SB13; Tr. 32.

4. The best-selling bag closing machine is the 872XLS automatic bag closing machine ("872 machine"). SB4 at KL0001276; Paxton Dep. Vol. I. at 261. The 872 machine has a lok track that is

designed to feed closures from a reel onto an assembly line of
bags running on a conveyor belt. The 872 machine seals the
bags, removes the closures from a large strip of closures, and
attaches the closure to the mouth of bag.  Tr. 415; KL227 at
KL001413-18. Kwik Lok also manufactures other models of
automatic bag closing machines that are compatible with
different closures. See generally KL227.

**B.**

5. The first bag closure product created by Floyd Paxton, the
   founder of Kwik Lok, was a hand-applied closure made in the
   early 1950s. Tr. 410.

6. In 1962, Kwik Lok introduced the first bag closure that was
   designed to work in an automatic bag closure machine, the J-
   series closure. The J-series was the first closure that was
   not hand applied. Tr. 414; KL411.

7. Closures are made from an extruded sheet of plastic that is
   slit into a specified width. The strip of plastic is then
   coiled up and then uncoiled to run through a die cutting
   machine that stamps the desired closure shape. Tr. 410-411.

8. Kwik Lok is the owner of a U.S. trademark registration, the
   '043 Registration, which is a graphic rendering of a bag
   closure for "plastic closures for bags" in International Class
   20. Tr. 448. That graphic rendering is depicted below. SB2.



9. Kwik Lok has asserted the following features of the trade
   dress in the '043 Registration: square or slightly rectangular
   three-dimensional configuration of the perimeter of the
   plastic closure that includes chamfers or beveled portions on
   each corner and a beveled triangular slot opening at the
   center of one side. Tr. 417, 448, 530.[2]

10. Kwik Lok filed the application for the '043 Registration in May
    1990. The application, Application No. 74/055742 ("'742
    Application"), was accepted for registration by the Patent and
    Trademark Office ("PTO") in 1996. Tr. 337.

11. The '742 Application also included a specimen of use, known as
    the J-Series, an example of how the asserted trade dress was used
    in commerce. KL811. Kwik Lok submitted additional specimens, the
    W-Series and Y-Series closures, when it renewed its registration
    in 2001, and the J-series closure when it renewed its
    registration in 2006. KL808; KL821; KL 822; Tr. 353.[3]

---

[2] Kwik Lok asserted trade dress includes the square perimeter with chamfered
corners and a V-shaped opening at the center of one side. Kwik Lok does not
claim other features—the actual opening and the webbing or connectors along
the side of the closure. Tr. 530.
[3] The history of the '742 Application, which became the '043 Registration, was
presented in extensive detail at trial. Tr. 340-45; KL811-KL822. To
summarize, the PTO process included the following steps: (1) the PTO
initially denied the application for a trademark on the basis of

12. The '043 Registration, as accepted by the PTO, included specimens of closures that were hand-applied as well as specimens of closures that were connected together in strips for automated bag application. Tr. 353:1-355:6; KL808; KL821; KL822.

13. Although Kwik Lok has distributed several slight variations of Kwik Lok's bag closure products, these products are substantially the same shape as the closure in the '043 Registration. Tr. 412, 414, 448-449.

14. Kwik Lok's claimed trade dress in this litigation, which is referred to in the pleadings as "the Beveled and Notched Kwik Lok Product Configuration," includes thirteen different series of closures, of which the "J-NRP" or Non-Residue Producing series of closures is by far the best selling. SB4; Paxton Dep. Vol. I at 122-28.

15. The J-NRP series of closures was developed in response to a problem with the webbing of other J-series closures. The J-NRP closure, illustrated below, was designed to minimize the production of residue. Tr. 420-26.

---

functionality, KL812; (2) reaffirmed denial on that basis, KL813; (3) approved the publication of the trademark in May 1992, KL808; (4) reversed course in September 1992 and denied the application on the basis that the closure was a "common geometric design" and was not "inherently distinctive," KL814; (5) suspended the application while a lawsuit against Kwik Lok was pending, KL815, KL808; (6) issued a final refusal of the application in September 1994, on the grounds that the shape is not inherently distinctive, it performs a functional purpose, and that there was insufficient evidence of distinctiveness, KL817; and (7) approved the trademark application in 1996 after Kwik Lok formally moved to appeal the PTO's decision to the Trademark Trial and Appeal Board, KL818-19.



16. The J-NRP closure can be used in semi-automatic bag closing machines as well as in automatic bag closing machines. Tr. 427; KL5 at KL0008444; KL227 at KL0001395.

17. The most common machine on which the J-NRP closure is used is the 872 machine. The J-NRP closure remains Kwik Lok's best-selling closure, and Kwik Lok's most common automatic bag closing machines are designed to work with the J-NRP closure. SB4; SB12.

18. The bag closures that work in the automated bag closing machines are provided to customers in reels where the closures are in strip form with thousands of closures in each reel. Tr. at 414-15; KL406 at KL0008622. The minimum order quantity for the J-NRP closure is 60,000 closures—or 15 reels of 4000 closures. Tr. 307.

19. The reel is mounted on a bag closing machine and the strip is fed into the automated bag closing machine. Tr. at 414-415; KL406 at KL0008622.

20. The lok track is the portion of the automatic bag closing machine in which the closures are inserted and applied to bags. KL406 at KL0008683-89; KL412 at KL0008912 at 1:29-3:37.

21. The shape of the plastic closure is determined by the specifications of the lok track. Tr. 35; Tr. 84-85.

22. It takes 15 to 30 minutes to replace a customer's lok track. Tr. 513. A lok track for the 872 Machine would cost "a couple hundred dollars." Paxton Dep. Vol. II at 64-65.

23. Lok tracks are not normally changed. When customers purchase a bag closing machine it comes with a certain type of lok track and normally customers do not replace or install any other lok track on that machine. Tr. 35-36, 80; Paxton Dep. Vol. II at 62-63.

24. The life span of an automatic bag closing machines is 20 years, if properly maintained. Tr. 306.

25. Selling bag closing machines is important to Kwik Lok because it "establishes the customer," which means that it creates a customer for bag closures. Paxton Dep. Vol. II at 31.

26. In each of the last 10 years, Kwik Lok has sold many billions of its bag closures in the United States. For the year ending March 31, 2013, Kwik Lok sold over 9 billion bag closures, the majority of which were bag closures attached to each other in strips. SB4.

**C.**

27. Kwik Lok employs slightly fewer than 31 salespeople in the United States. Tr. 305. These salespeople promote and sell

Kwik Lok bag closure equipment and Kwik Lok bag closures. Tr. 305. The regional salespeople sell directly to consumers by calling customers and by promoting goods at trade shows. Tr. 298.

28. Kwik Lok's bag closure products are also sold by distributors throughout the United States. Tr. 298. Kwik Lok currently has almost 200 independent, non-exclusive distributors in the United States. Tr. 299, 303. These independent distributors are responsible for about 80% of Kwik Lok's sales. Tr. 298.

29. Kwik Lok has no formal agreements with these independent distributors. Tr. 299, 384.

30. Kwik Lok's distributors are free to sell third-party bag closure products side by side with the Kwik Lok products. Tr. 299, 384.

31. In some cases, Kwik Lok does not have contacts with the customers because distributors place orders on behalf of customers. Tr. 300.

32. Kwik Lok does not sell any equipment or any bag closures for individual use. Paxton Dep. Vol. I at 111.

33. Kwik Lok bag closures are distributed in cartons, identifiable by the red Kwik Lok logo and the words "Kwik Lok" on the outside of the carton. SB136.

34. Kwik advertises and promotes its '043 Product Configuration through the use of the Kwik Lok logo (pictured below) ("Kwik

Lok Logo", Trademark No. 1,084,804). Tr. 292-95; KL332, KL333, KL334, KL336 and KL359.



35. The Kwik Lok Logo is featured on almost all of Kwik Lok's marketing materials (including Kwik Lok's product packaging, website, catalogs, advertising and promotional materials, displays, and letterhead). Tr. 295; KL3, KL336, KL824, KL 232, KL5, and KL209.

36. Kwik Lok advertises its closures as "The Bag Closure of Choice When It Comes To Function, The Environment And Consumer Convenience!" SB101 at KL0009104, and as being "Easy to Open," "Easy to Close," and "Easy to Read." SB101 at KL0009105. Those claims are accompanied with illustrations of a customer's fingers gripping the flat outer edges of the J-NRP closure. Id.; Tr. 309-10.

37. Kwik Lok has also specifically advertised the role that the "uniquely simple" design of the J-NRP closure contributes to a "bag closing machine with few moving parts and simple mechanical motions." SB164 at KL0002876. The bag closing machine referenced in this advertisement is the 872 machine. Tr. 313. Kwik Lok advertises that the simple design of the J-

NRP closure allows it to make a machine that requires less downtime, less maintenance, higher production speeds, and fewer repair bills. SB164 at KL0002876.

**D.**

38. Schutte B.V. is a Netherlands corporation that produces, distributes and sells worldwide a wide range of bag closures and binding materials, including Clipband, twist ties, and Schutloks. Tr. 25, 28, 100; KL830 ¶ 3; KL19 at KL0001070, KL0001073, KL0001075, KL0001063.

39. Schutte and Kwik Lok were involved in litigation in the Netherlands over the alleged trademark infringement of Kwik Lok's bag closure by the Schutlok closure product, an all plastic closure that Schutte had developed and sold in Europe. Tr. 28. Judgment was ultimately entered in Schutte's favor. Tr. 30. The Judgment was finalized in 2012.

40. Schutte redesigned its re-usable sheet plastic closures, and specifically its Schutlok type G closure, so that the design of its closures would be as different as possible from any Kwik Lok closures and still perform at the same or higher level. Tr. 45, 78.

41. Schutte became interested in entering the United States market, and conducted some research into customer preferences within its prospective target consumer base: bakeries. Tr. 47.

Schutte concluded that bakeries were concerned with whether the closures would run on their automatic machines. Tr. 32-33.

42. Schutte B.V. incorporated Schutte, Inc., a wholly owned subsidiary of Schutte B.V., in New York with the intention of entering the United States market.

43. Schutte B.V. manufactured the Clipps G Series bag closure products in the Netherlands, a product that Kwik Lok claims infringes the trade dress in its '043 Registration and the J-NRP Product Configuration. KL830 ¶ 2.

44. The new Schutte closure, the Clipps G, has corners that are rounded, not beveled, the bottom is flat with a concave middle, and the webbing is at the top and bottom of the flat vertical ends. Tr. 45, 81-82; KL428.

45. Schutte tested the Clipps G closure on all machines available to it in the Netherlands, including the Kwik Lok 872 machine. Tr. 78-79.

46. Below are side by side photographs of Schutte's Clipps G Series (on the left) and Kwik Lok's J-NRP Series closure (on the right).



47. "Schutte Inc. has not designed, manufactured, offered for sale, and/or sold any products in the United States." KL830 ¶ 1. However, in June of 2012, Schutte B.V. shipped over 100,000 samples of the Clipps G Series bag closure products and various marketing and other promotional materials to Schutte, Inc. and TABS, Inc. in New York, which were then sent to potential customers in New York. Schutte Bagclosures Inc., 48 F. Supp. 3d at 682, 685; Sec. Am. Compl. ¶ 126; KL830 ¶¶ 10 11, 7.

48. Schutte, Inc.'s bag closures are sold in boxes with the Clipps logo and trademark imprinted all over the box. Tr. 48-49. Both Kwik Lok and Schutte, Inc. clearly mark all their promotional material, website, and packaging material, such as cartons, with their respective trade names and logos, which are materially different in size, text, and color. Tr. 43-44, 48-49.

49. Schutte, Inc.'s targeted customers are large wholesale and industrial bakeries in the United States. Tr. 47. Schutte, Inc. targets those potential customers by finding potential distributors who specialize in supplying bakeries. Tr. 47. Schutte, Inc. would not select a distributor that also sells Kwik Lok products. Tr. 47-48.

### III. CONCLUSIONS OF LAW

Schutte, Inc.'s first claim for relief is for a declaration of non-infringement under the Lanham Act and New York law. Kwik

Lok's first counterclaim for trade dress infringement under the
Lanham Act overlaps with Schutte, Inc.'s first claim.[4] Schutte,
Inc.'s second claim for relief is for a declaration of non-
dilution under the Lanham Act and New York law. This claim
overlaps with Kwik Lok's third claim for federal trade dress
dilution and fifth claim for dilution and injury to business
reputation under New York General Business Law § 360-l. Schutte,
Inc.'s third claim for relief is for a declaration of invalidity
and order of cancellation of Kwik Lok's '043 Registration
pursuant to 15 U.S.C. § 1119. The issues in this case are
twofold (1) whether Kwik Lok can assert trade dress protection
in the '043 Registration and the J-NRP Product Configuration,
(2) and if so, whether Schutte infringed Kwik Lok's trademark
and/or trade dress by designing and producing Clipps G closures.

## A.

1.  The Lanham Act's regime of protection for trademarks and
    trade dress protects manufacturers from the kind of imitation
    that "capitaliz[es] on a consumer's inability quickly to
    evaluate the quality of an item offered for sale." Qualitex
    Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 164 (1995).
2.  "[T]rade dress encompasses the design and appearance of the
    product together with all the elements making up the overall

---

[4]Although Schutte, Inc. is the only plaintiff, Kwik Lok has asserted its
counterclaims against both Schutte entities.

image that serves to identify the product presented to the
consumer." Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111
F.3d 993, 999 (2d Cir. 1997) (internal quotation marks
omitted). The Lanham Act protects both registered and
unregistered trade dress. See, e.g., Two Pesos, Inc. v. Taco
Cabana, Inc., 505 U.S. 763, 773 (1992).

3. Courts "exercise particular caution when extending protection to
product designs." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101,
114 (2d Cir. 2001) (internal quotation marks and citation
omitted). Indeed, "product design almost invariably serves
purposes other than source identification." Wal-Mart Stores, Inc.
v. Samara Bros., Inc., 529 U.S. 205, 213 (2000) (noting that
"even the most unusual of product designs – such as a cocktail
shaker shaped like a penguin – is intended not to identify the
source, but to render the product itself more useful or more
appealing").

4. "[T]rade dress claims raise a potent risk that relief will
impermissibly afford a level of protection that would hamper
efforts to market competitive goods." Yurman, 262 F.3d at 115
(internal quotation marks and citation omitted). Overextension
of trade dress protection "can undermine restrictions in
copyright and patent law that are designed to avoid
monopolization of products and ideas. Patent and copyright law
bestow limited periods of protection, but trademark rights can

be forever." Id. (internal quotation marks and citation omitted).

5. To prevail on a claim for trade dress infringement under § 43(a) of the Lanham Act, a plaintiff must prove "(1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's." Yurman, 262 F.3d at 115. The plaintiff must prove distinctiveness by showing secondary meaning, namely "that in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." Id. (internal quotation marks omitted).

6. Under the Lanham Act, registration of a trademark constitutes prima facie evidence of the trademark's validity, and the registrant's ownership and exclusive right to use the mark. See 15 U.S.C. § 1115(a); 15 U.S.C.S. § 1057(b). Use of a registered mark for five consecutive years renders the mark incontestable. Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 476 (2d Cir. 1996). An incontestable registration constitutes "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." See 15 U.S.C. § 1115(b). However, an incontestable mark may be challenged on the grounds that it is functional. See id.

7. When a trademark owner sues for infringement of a registered and incontestable mark, the infringer bears the burden to rebut the presumption of the mark's protectability by a preponderance of the evidence. See Lane Capital Mgmt. v. Lane Capital Mgmt., 192 F.3d 337, 345 (2d Cir. 1999); Vox Amplification Ltd v. Meussdorffer, 50 F. Supp. 3d 355, 372 (E.D.N.Y. 2014) ("In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence, that the mark is ineligible for protection." (internal citation omitted)).[5]

8. The only defense that is asserted against the validity of the trade dress in this case is that it is "functional." Because the mark is registered and incontestable, the burden is on Schutte to prove that the registered mark is functional.

9. The burden is reversed for marks that are not registered. 15 U.S.C. § 1125(a)(3)("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional").

---

[5] Because the '043 Registration has been in effect for more than five years, certain aspects of the Registration are incontestable such as Kwik Lok's ownership of the mark and Kwik Lok's exclusive right of use. See 15 U.S.C. § 1115(b). Because of its incontestable status, the secondary meaning of Kwik Lok's mark is conclusively presumed. A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC, 131 F. Supp. 3d 196, 214 (S.D.N.Y. 2015) (collecting cases).

**B.**

**(1)**

10. Kwik Lok's asserted trade dress sufficiently identifies the elements of the trade dress: a square to slightly rectangular outer perimeter having beveled corners and a triangularly-shaped slot opening. See <u>Landscape Forms v. Columbia Cascade Co.</u>, 113 F.3d 373, 381 (2d Cir. 1997) ("Without such a precise explanation of the character and scope of the claimed trade dress, litigation will be difficult [.]").

11. Schutte's Clipps G closure most closely resembles the J-NRP Product Configuration, although Kwik Lok contends that the Clipps G also infringes its '043 Registration.

12. A threshold issue is whether the J-NRP Product Configuration is an unregistered mark that is potentially subject to common law trade dress protection or whether it is part of the trade dress embodied in the '043 Registration.

13. Schutte argued at trial that the J-NRP Product Configuration was an unregistered trade dress. Kwik Lok argued that the PTO's acceptance of the W-Series, Y-Series, and J-Series specimens as part of the '043 Registration should receive deference. Kwik Lok also argued that the differences between the J-Series closure and the J-NRP Product Configuration are minimal and therefore, the J-NRP Product Configuration should also be considered part of the '043 Registration.

14. Courts in this Circuit give great deference to the PTO's decision to register a particular mark. E.g., The Murphy Door Bed Co., Inc. v. Interior Sleep Sys. Inc., 874 F.2d 95, 101 (2d Cir. 1989); M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha, 250 F. Supp. 2d 91, 98 (E.D.N.Y. 2003) (collecting cases).

15. The PTO accepted Kwik Lok's specimens of use as part of the '043 Registration and did not find that the specimens were a "material alteration" of the '043 Registration. Tr. at 353-54; KL808; KL821; KL822.

16. The '043 Registration can be reasonably construed to cover the Kwik Lok product lines submitted to the PTO because the PTO accepted the various specimens submitted by Kwik Lok—the W-Series, the Y-Series, and J-Series. By accepting these specimens in connection with the maintenance of the '043 Registration, the PTO found that those specimens (i.e. W-Series, Y-Series and the J-Series) were covered within the scope of the '043 Registration. See KL820, KL811 at KL0000969; KL821; KL822 at KL0000423; KL808.

17. The differences between the original specimen of the '043 Registration and the later specimens of use do not represent a material alteration of the registered mark. See Ex Parte Petersen & Pegau Baking Co. (by Change of Name, P. F. Petersen

Baking Co.), 100 U.S.P.Q. (BNA) 20 (Com'r Pat. & Trademarks Oct. 9, 1953).

18. Kwik Lok's '043 Registration is incontestable based on the registration approved by the PTO in May 1996. KL820. Moreover, based on the specimens of use submitted to and accepted by the PTO, the '043 Registration covers multiple Kwik Lok plastic bag closure products having the same trade dress features: a square to slightly rectangular outer perimeter having beveled corners and a triangularly-shaped slot opening. KL808; KL811, KL821; KL822.

19. Therefore, the incontestable '043 Registration covers the W-Series, the Y-Series, and J-Series closures, including the J-NRP closure. Therefore, it is unnecessary to determine whether the J-NRP closure is entitled to common law trade dress protection.

**(2)**

20. In its post-trial submissions, Kwik Lok exhaustively outlined the history of the '742 Application and ultimate approval of the '043 Registration, underscoring the fact that the PTO considered whether the '043 Registration was functional and eventually concluded that it was not.

21. At trial, Dr. Beebe explained the long and inconsistent history of the '043 registration, including the ultimate decision by the PTO in the final office action. Tr. 346-51. It

bears noting that in 1994, the PTO determined that the shape
of the closure was functional because "its shape serves to
provide a cleaner separation between each closure . . . the
notched corners of the bag closures appe[a]r to be
specifically designed for use with packaging machinery,
providing an efficient manner to restrain each closure while
the one before it is being affix[e]d to the container or
package." KL817 at KL0000459. However, after Kwik Lok filed a
request for reconsideration and appealed to the Trademark
Trial and Appeal Board, the PTO approved the publication of
the mark, and the PTO found no other deficiencies as of
January 16, 1996. Tr. 351. In contrast to the preceding office
actions, the PTO did not issue an explanation or decision. See
infra note 3.

22. The PTO's office actions from 1991 to 1996 deserve little
    weight. As evidenced by the extensive history of the '742
    Application and '043 Registration, the PTO struggled mightily
    to arrive at a final determination as to the closure's
    functionality. More importantly, the PTO made its final
    determination in 1996, before TrafFix clarified the
    functionality standard and its intersection with patent law.

23. As mentioned earlier in the context of the scope of the '043
    Registration, a decision of the PTO generally receives great
    deference. Murphy Door, 874 F.2d at 101; M & G Elecs. Sales,

250 F. Supp. 2d at 98. But, "in the end, the Court is not bound by such an initial determination, and is obligated to ultimately render its own decision on the merits." Real News Project Inc. v. Indep. World Television Inc., No. 06-cv-4322 (GEL), 2008 WL 2229830, at *10 n. 14 (S.D.N.Y. May 27, 2008) (internal quotation marks and citation omitted).

24. In this case, although the earlier PTO actions explained why the Kwik Lok closure was functional or otherwise ineligible for registration, the final action that led to the approval of the '043 Registration did not include any explanation. Compare KL812, KL813, KL817 with KL819. Given the conflicting history of the '742 Application and the relatively sparse information on the final decision to register Kwik Lok's trademark, the registration decision carries little weight on the specific issue of functionality. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 221 (3d Cir. 2000) (declining to give much weight to the PTO decision because "the PTO attorney's decision was conclusory, not searching or analytical"); Cf. Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 14-3456-cv, 2016 WL 2893172, at *12 n.5 (2d Cir. May 18, 2016).

25. Kwik Lok notes that the PTO reviewed eighteen of the patents that Schutte submitted in this case as evidence that features of the trade dress has been previously disclosed in utility

patents. But the PTO's review took place before the Supreme Court's decision in 2001 in TrafFix that underscored the importance of utility patents to the functionality inquiry. 532 U.S. at 29 (noting that a "utility patent is strong evidence that the features therein claimed are functional").[6]

26.   Accordingly, the measure of deference given to the final PTO determination accepting the '043 Registration is limited and the Court must undertake an independent analysis of the asserted trade dress to determine whether it is functional under the governing standards of TrafFix.

**(3)**

27. The exclusive right to use an incontestable trademark is subject to a defense that the mark is functional. 15 U.S.C. § 1115(b). Similarly, Section 14 of the Lanham Act lists the grounds under which an action to cancel a trademark may be filed. See 15 U.S.C. § 1064. The grounds for cancellation include that the trademark is functional. Id. § 1064(3).

---

[6] As the McCarthy Treatise notes, it was not until 1998, two years after the '043 Registration was approved, that functionality was added to the list of possible challenges to an incontestable mark. 1 McCarthy on Trademarks and Unfair Competition ("McCarthy") §§ 7:63, 7:84 (4th ed.); see Pub. L. No. 105-330, 112 Stat. 3064 (1998) (amending Sections 14(3) and 33(b) of the Lanham Act), 15 U.S.C. §§ 1115(b) (listing functionality as a defense to incontestability), 1064(3) (listing functionality as a ground for cancellation of registration).

28.  In this case, Schutte contends that the '043 Registration and
     the J-NRP Product Configuration are functional and seeks
     cancellation of the '043 Registration and a declaration of
     non-infringement.

29.  Because the '043 Registration is an incontestable
     registration and covers the J-NRP Product Configuration, the
     burden is on Schutte to prove the functionality of the '043
     Registration and the J-NRP Product Configuration. See e.g.,
     McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 311
     (4th Cir. 2014) ("The party challenging a registered mark-has
     the burden of showing functionality by a preponderance of the
     evidence."); Vox Amplification, 50 F. Supp. 3d at 373 ("because
     [the Defendants] registered the [Phantom Body Shape mark], the
     burden falls to [the Plaintiffs] to prove functionality"
     (internal quotation marks and citations omitted)).

30.  The purpose behind the functionality defense is to
     "prevent[] trademark law, which seeks to promote competition
     by protecting a firm's reputation, from instead inhibiting
     legitimate competition by allowing a producer to control a
     useful product feature." Qualitex, 514 U.S. at 164.

31.  The legal principle that "the nonfunctionality requirement
     protects competition even at the cost of potential consumer
     confusion," is "even more critical" in a product configuration
     case rather than a packaging case "because a monopoly right in

the design of the product itself is more likely to preclude competition." Yurman, 262 F.3d at 116 (internal quotation marks and citations omitted). Consequently, "'[r]igorous application' of the requirement of nonfunctionality is necessary 'to avoid undermining the carefully circumscribed statutory regimes for the protection of useful and ornamental designs under federal patent and copyright law.'" Id. (quoting Restatement (Third) of Unfair Competition, § 16 cmt. b at 158).

32. There are two ways in which the evidence can show that a design is functional and therefore not sufficiently distinctive to warrant protection under the Lanham Act. First, the evidence may demonstrate that a product's design feature is "'essential to the use or purpose of the article.'" Alternatively, the evidence may reveal that the design feature itself "'affects the cost or quality of the article.'" TrafFix, 532 U.S. at 32 (quoting Qualitex, 514 U.S. at 165); see also Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n. 10 (1982). To be considered functional, the product configuration need not be a competitive necessity. TrafFix, 532 U.S. at 32-33. "[A] functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" Id. (quoting Qualitex, 514 U.S. at 165). A product configuration

that is merely ornamental, incidental, or arbitrary is not
functional. Id. at 30.

33. Kwik Lok argues that the J-NRP Product Configuration,
comprised of a square or slightly rectangular three
dimensional configuration of the perimeter of a plastic
closure that includes chamfers or beveled portions on each
corner and a beveled triangular slot opening at the top of the
closure, is an arbitrary and unique design that is not
essential to the use or purpose of the closure.

34. Kwik Lok's claimed trade dress in the '043 Registration and
the J-NRP Product Configuration is not ornamental or
arbitrary. It is basically a square that fits comfortably in a
lok track to be used to close bags of merchandise. The shape
of the closure is essentially a square. SB2; SB8. To the
extent that Kwik Lok's claimed trade dress configurations
deviate from a simple square shape, they do so in minuscule
ways. For example, the corners of Kwik Lok's square bag
closures are beveled rather than right angles like the corners
of a square. SB2; SB8. This deviation from the basic square
shape is not ornamental, however, considering the amount of
material removed from each of the corners is no more than a
few millimeters and therefore barely changes the generally
square shape communicated by the closure. The only other
deviation from the square shape of the closure is the V-shaped

opening through which the bag is inserted. SB2; SB8. But the opening is a functional feature of the closure to allow the bag to enter the closure. The design of Kwik Lok's claimed trade dress configurations is inherently basic and plainly not ornamental or designed to be a source identifier. See, e.g., TrafFix, 532 U.S. at 30; Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 158 (6th Cir. 2003) ("In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional.").

35. While the configuration of the closures may not necessarily be essential to the use or purpose of the article, it does affect the cost or quality of the bag closure.

36. An asserted trade dress "affects the cost or quality of the article where it permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods." Christian Louboutin S.A. v. Yves Saint Laurent, 696 F.3d 206, 219 (2d Cir. 2012)(internal quotation marks omitted). A finding that the product feature is functional under this utilitarian test renders the feature ineligible for trademark (or trade dress) protection. See id. The trial evidence established that the simple shape of the closures at issue facilitates the efficient use of the articles in

automatic machines and reduces possible costs to the

manufacturers of the closures and the purchasers of the

closures.

37. The trade dress should be analyzed in the context of how it is actually used in the market. The most common way in which the closures are applied is by machines and the most commonly used machine in the United States is Kwik Lok's 872 machine. Kwik Lok's 872 machine can apply bag closures at a rapid pace in excess of one per second. SB25 at KL0001413 (at speeds up to 110 closures per minute); Paxton Dep. Vol. I at 261. The 872 machine employs a lok track through which a strip of connected J-NRP closures passes before the individual closures are applied to the bags.

38. Although they may look like simple pieces of plastic, bag closures are products of considerable engineering designed to ensure that the closures perform several important functions. Only Kwik Lok currently sells bag closures that work in the 872 machine and the vast majority of the bag closures that are used in the 872 machine are the J-NRP model closure that embodies the trade dress claimed by Kwik Lok.

39. Kwik Lok acknowledges that it designs the relevant parts of these industry-leading machines to work with J-NRP closures. Tr. 477. To that end, the industry-leading 872 machine is initially sold together with the J-NRP closures. Tr. 306.

40. Dr. Paul Koch, who received a doctorate in Plastics Engineering and has considerable expertise in working with and testing plastic products, is a Professor Emeritus at Penn State University in the Plastics Engineering Technology Department, where he has taught for 25 years and is recognized as one of the leading experts in plastic products in the world. Tr. 129-32. Dr. Koch has studied Kwik Lok's claimed trade dress configurations and the forces exerted on a bag closure during its application by the 872 machine and by the consumer of a bag of bread. Tr. 132-33. Dr. Koch testified credibly that the features that are common to both Kwik Lok's registered and unregistered trade dress greatly affect the quality of those bag closures' performance. Tr. 173.

41. According to Dr. Koch, the essentially square shape of those bag closures improves the quality of the product because the flat bearing areas on the top, bottom, and sides of the device are important for withstanding the forces exerted on the closure as it is moved through the machine, separated, and applied to the bag. Tr. 164. As the bag closure passes through the lok track of the 872 machine, each side of the bag closure is subjected at different times to forces either holding the closure in place or disconnecting the closure from the strip of closures. Tr. 134-40. If the side of the closure is not even, the pressure applied can be uncertain or unpredictable

31

which can lead to malfunctioning and costly inventory backups.
Tr. 139-40. According to Dr. Koch, the essentially square
shape is also the most economically efficient use of the
plastic sheet from which the closures are stamped.

42. Furthermore, Dr. Koch testified that the closure should not
have hollowed out or punched out areas, which would
significantly weaken the overall strength of the closure and
make mass production more expensive. Tr. 172. The overall
strength of the closure is of particular importance because
the forces mentioned above can cause an insufficiently strong
closure to malfunction or, if a weak closure breaks during use
by the end purchaser, it can cause customer dissatisfaction.
Tr. 172. As Dr. Koch credibly explained, the absence of
hollowed-out areas allows a closure to contain the most
material permitted and be as strong as possible within the
general size prescribed by the 872 machine and lok track. Tr.
165-66.

43. At trial, the parties presented videos of how the 872 machine
operates, and the speed by which the closures pass through the
lok track. The lok pick engages the slot between closures to
advance the next closure into the closing position. KL412.
Additional hollowed out or punched out parts could cause the
lok pick to catch these other parts and destroy the closure.
Tr. 184, 186.

44. As several witnesses testified, the height, width, and thickness of closures that can work in the 872 machine and the lok track must fit in an extremely narrow range or else they will not work. Tr. 84-85, 164-65, 442-43, 535. Within those narrow ranges, the shape that can fit the most material permitted, and therefore have the most strength and the least cost, is by definition the essentially square shape that is claimed by Kwik Lok. Tr. 86, 165-66.

45. The fundamentally square shape is also dictated by where the webbing between the closures must be located. The bag closures are disconnected using a radial action. Tr. 168-69. If the webbing was located closer to the center of the closure, there is a likelihood that the bag closure would not break off cleanly because the radial force would be insufficient to snap the webbing. Tr. 168-69.

46. Not only must the closure have an essentially square shape, each of the sides of the closure must be largely composed of flat edges. For example, the sides of the closure that are connected with webbing to other closures must be able to accept the pawl on the lok track that keeps the strip of closures in place as the bag is being inserted into a closure and that closure is broken off. Tr. 170. If the sides of the closure are not flat, the strip of closures could move and

that could affect the position of the closure opening at the time the bag is inserted. Tr. 170.

47. Similarly, the bottom edge of the closure must also have flat areas on either side of that edge because it is resting on a flat cross-sectional area to help the closure resist the forces applied when the bag is inserted and when the adjacent closure is disconnected. Tr. 170. Those flat areas allow the closure to best spread the forces over the greatest area and reduce the amount of localized pressure. Tr. 89, 171.

48. Furthermore, the straight funnel shape of the opening on the top edge of the Kwik Lok's bag closure designs allows a uniform expansion of the energy required to insert the bag. Tr. 167. The top edge of the closure on either side of the opening must also be flat because that is the area that is acted on by the disconnection bar of the lok track. As a result, it is important for that part of the closure to have a rigid corresponding area so it will not deform when struck by that bar. Tr. 171.

49. The straight lines of the opening allow the energy required in inserting the bag to be spread out over a consistent or uniform area, thereby preventing it from being bunched up or snagging and minimizing the amount of energy required to insert the bag. Tr. 168.

50. Therefore, the shape of Kwik Lok's asserted trade dress is the strongest available shape and clearly affects the quality of the closure. <u>See</u> <u>TrafFix</u>, 532 U.S. at 32; <u>Christian Louboutin</u>, 696 F.3d at 219. It also works efficiently with bag closing machines thereby allowing increased operating speeds, and decreased downtime, maintenance costs, and damaged packages. <u>See</u> Conclusions of Law ¶¶ 81-83.

51. Kwik Lok points out that it is "improper for defendants to break the trade dress down into specific elements and call them functional" citing <u>Cartier Inc. v. Sardell Jewelry, Inc.</u>, 294 F. App'x 615, 620-21 (2d Cir. 2008). "Even if individual elements of a trade dress are functional, their arrangement or combination may be arbitrary, fanciful, or suggestive and thus deserve trade dress protection." <u>Coach, Inc. v. We care Trading Co.</u>, 67 F. App'x 626, 629 (2d Cir. 2002) (internal quotation marks and citations omitted). However, not only is each feature of the trade dress independently functional, but as a whole the shape of the closure affects the cost and quality of the closure. A closure with a basically square or slightly rectangular shape, flat edges, beveled corners, and a funnel shape at the top of closure works efficiently as a result of the shape in closing the bag and in sustaining the force of the 872 machine when a closure is disconnected and placed on a bag.

35

52. Moreover, disclosure of design features in the claims of an
    expired utility patents constitutes "strong evidence" that
    those features are functional. See, e.g., TrafFix, 532 U.S. at
    29; New Colt Holding Corp. v. RJG Holdings of Fla., Inc., 312
    F. Supp. 2d 195, 212 (D. Conn. 2004). "When the expired patent
    claimed the features in question, one who seeks to establish
    trade dress protection must carry the heavy burden of showing
    that the feature is not functional, for instance by showing
    that it is merely an ornamental, incidental, or arbitrary
    aspect of the device." TrafFix, 532 U.S. at 30. In this case,
    the utilitarian advantages of Kwik Lok's claimed trade dress
    configurations are disclosed in the utility patents that Kwik
    Lok has obtained over the past five decades in connection with
    the bag closing system that uses its claimed trade dress.

53. An example of a disclosure of Kwik Lok's claimed trade dress
    configurations can be found in U.S. Patent No. 3,270,874 ('874
    Patent). SB103. That patent was issued on September 6, 1966
    and is for "Polystyrene Multi-Closure Strip Scored for
    Separation Into Individual Closures." This patent claims a
    particular shape of polystyrene plastic bag closures whose
    sides are parallel "transverse axes" and symmetrically spaced
    from a "bag-neck-confining mouth and a narrow opening located
    in a longitudinal side" of the closure. As seen in the figure
    below, the patent's claims disclose the flat-sided, almost

36

square closure with a tapered opening on one side that Kwik Lok seeks to protect indefinitely using trademark law now that this patent has expired.

54. This patent's disclosure of the utilitarian benefits of Kwik Lok's claimed trade dress configurations is underscored further through examination of the preferred embodiment of that patent. The preferred embodiment references an illustration that portrays a bag closure that looks strikingly similar to Kwik Lok's claimed trade dress, as demonstrated below. The text describing that preferred embodiment discloses a closure "7/8 inch in width" which has "bag-neck-confining mouth which is connected to one of the edges of the closure by 2 narrow opening[s] having widely flaring lips" and, in the corners, "[n]otches . . . arranged symmetrically relative to transverse axes." SB103.



55. Kwik Lok's expired patent no. 3,164,250 ("'250 Patent") makes similar disclosures regarding the arrangements of the

closures' notches, opening, and sides (or "parallel walls," as they are referred to in that patent, which "substantially improves the smoothness of the separation of the webs"). SB135. More specifically, the first claim of this patent requires that the webbing be "spaced far enough apart length-wise" so that when "compressive forces applied in the plane of said strip from opposite directions respectively to said consecutive closures and through said closures to opposite ends of said web means without causing said closures to buckle." The "compressive forces applied in opposite directions" in this claim refers to forces like those applied by the lok track, as seen in the figure below. Because the webbing must be far enough apart, the closure is required to have a fundamentally square shape. The illustration referenced in the preferred embodiment of this patent also demonstrates the utility of the closures' design to the claimed invention, as demonstrated below.



56. The drawings in the '250 Patent depict Kwik Lok's claimed trade dress and underscore the importance of using that trade dress in the efficacy of the claimed invention. SB135. The patent demonstrates the utilitarian advantages that take place when the invention is used in connection with closures *using the dimensions shown* and makes clear that a bag closure that incorporates those dimensions is an inherent part of the benefit of that invention.

57. All of these elements disclosed in these patents combine to comprise Kwik Lok's claimed trade dress configurations in this action – flat sides with an opening on one side and "notches" on the corners. The disclosure of Kwik Lok's claimed trade dress as part of the preferred embodiment of this patent

underscores the functionality of that design. See, e.g.,

Georgia-Pac. Consumer Prods., 647 F.3d at 729; Berlin

Packaging, LLC v. Stull Tech., Inc., 381 F. Supp. 2d 792, 803

(N.D. Ill. 2005); ASICS Corp. v. Target Corp., 282 F. Supp. 2d

1020, 1026-28 (D. Minn. 2003).[7]

58. Kwik Lok argues that the patents do not claim the specific

90-degree V shaped opening that is part of the asserted trade

dress in the mouth of the closure. But the patent claims need

not be so specific. In Traffix, the dual springs of the

traffic sign claimed in the patent were farther apart than the

springs in the asserted trade dress. Traffix, 532 U.S. at 30.

Kwik Lok's '250 Patent discloses the "bag confining mouth and

a narrow opening located in a longitudinal side edge" SB135,

and the '874 Patent similarly describes "a narrow opening

located in a longitudinal side edge  . . . and communicating

with said mouth for admitted a bag-neck therein, said mouth

and openings being symmetrical with respect to [the]

transverse axes across said strip." SB103. Although Kwik Lok

argues that there could be "nearly infinite" possibilities of

---

[7] This case is unlike McAirlaids, Inc., where the Court of Appeals for the
Fourth Circuit distinguished TrafFix on the basis that McAirlaids's utility
patents covered a process and material, but not the particular pattern of the
asserted trade dress. 756 F.3d at 312. Although Schutte does point to the
utility patents over the bag closing machine process, see, e.g., SB92 ("Bag
Closing Machine" Patent No. 3,370,396), it is plain that the additional
patents mentioned above, see, e.g., SB135, cover the actual shape and
arrangement of the Kwik Lok closures. The "central advance" of the utility
patents is, among other things, the fundamentally square shape of the
closure. See id.; Traffix, 532 U.S. at 30.

a patent bearing symmetrical sides with an opening, the opening in Kwik Lok's asserted trade dress falls within the patent description.

59. Moreover, although Kwik Lok argues that the patent does not describe a functional benefit, the particular shape of the closure enables the closure to withstand the compressive forces that are applied to the closure in the 872 machine. This is plainly an important functional benefit of the particular shape of the closure. See SB135.

60. The '874 Patent also notes the utilitarian advantage of the bag closure having flat edges, as in Kwik Lok's claimed trade dress: "It is also desirable that the individual closure have a cleanly formed appearance when separated from the strip [of closures], thereby to be a merchandising asset." This invention specifically sought to have flat edges so the closure would not have "a ragged edge appearance to the individual closures [that] leaves protrusions thereon which can scratch a person's hands." SB103. Kwik Lok's expired utility patent no. 4,333,566 also cites the utility of bag closures having "a smooth edge with no protruding tabs." SB37. These statements constitute clear evidence of the utilitarian purpose of Kwik Lok's claimed trade dress.

61. Therefore, because Kwik Lok's trade dress affects the cost and quality of the closures, the asserted trade dress is

functional and cannot enjoy trademark or trade dress
protection. The disclosure in Kwik Lok's expired patents of
the features of the asserted trade dress is strong evidence of
the closure's functionality. See TrafFix, 532 U.S. 29-31.

**C.**

62. In their submissions, Kwik Lok and Schutte devote
considerable attention to the functionality factors set out in
In re Morton-Norwich, 671 F.2d 1332, 1340-41 (Fed. Cir. 1982).
Those factors were subsequently summarized by the Court of
Appeals for the Federal Circuit:

> (1) the existence of a utility patent that
> discloses the utilitarian advantages of the
> design; (2) advertising materials in which
> the originator of the design touts the
> design's utilitarian advantages; (3) the
> availability to competitors of
> functionally equivalent designs; and
> (4) facts indicating that the design is a
> comparatively simple or cheap method of
> manufacturing the product.

Valu Eng'g, Inc. v. Rexnord Corp., 278 F.3d 1268, 1274 (Fed.
Cir. 2002)

63. After TrafFix was decided in 2001, the majority of courts in
this Circuit have not explicitly employed the Morton-Norwich
factors but instead focused on the TrafFix test. See, e.g.,
Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d
114, 120 n.4 (2d Cir. 2001)(noting that the Supreme Court's

rulings in Qualitex and TrafFix "expand[ed] the functionality
doctrine" and that designs that are "useful" are functional
and ineligible for trademark protection); New Colt Holding
Corp., 312 F. Supp. 2d at 212-14; Spotless Enters., Inc. v.
A&E Prods. Grp. L.P., 294 F. Supp. 2d 322, 350 (E.D.N.Y.
2003), aff'd, 111 F. App'x 608 (Fed. Cir. 2004); Malaco Leaf,
AB v. Promotion In Motion, Inc., 287 F. Supp. 2d 355, 365-66
(S.D.N.Y. 2003); Yurman Design, Inc. v. Golden Treasure
Imports, Inc., 275 F. Supp. 2d 506, 511 (S.D.N.Y. 2003); GTFM,
Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 302
(S.D.N.Y. 2002).

64. The only post-TrafFix case within the Second Circuit that has
used the Morton-Norwich factors appears to be Telebrands Corp.
v. Del Laboratories, Inc., 814 F. Supp. 2d 286 (S.D.N.Y.
2011). In that case, the Court appeared to apply those factors
because both parties agreed that those factors should be
applied. See id. at 294; cf. GTFM, Inc. v. Solid Clothing,
Inc., No. 01-cv-2629 (DLC), 2002 WL 31886612, at *5 (S.D.N.Y.
Dec. 27, 2002) (stating that the Morton-Norwich "factors are
not used in the Second Circuit"). However, in Valu
Engineering, the Court of Appeals for the Federal Circuit
stated that it "d[id] not understand the Supreme Court's
decision in TrafFix to have altered the Morton-
Norwich analysis." 278 F.3d at 1276.

65.  As explained above, applying the <u>TrafFix</u> analysis, the
design in the '043 Registration and the J-NRP Product
Configuration is functional because it affects the cost and
quality of the product and the disclosure of functional
features of the closures in expired utility patents is strong
evidence that further supports a finding of functionality. For
purposes of completeness, however, the Court will consider the
parties' arguments with respect to the <u>Morton-Norwich</u> factors
which further support the conclusion that the trade dress
configurations in the '043 Registration and the J-NRP Product
Configuration are functional.

**(1)**

66. For the reasons set forth above in the discussion of Kwik
Lok's expired patents, the first <u>Morton Norwich</u> factor cuts in
favor of functionality. Kwik Lok obtained utility patents, now
expired, which disclosed the utilitarian advantages of the
designs.

**(2)**

67. The second <u>Morton Norwich</u> factor considers alternative
designs. <u>See</u> <u>Valu Eng'g, Inc.</u>, 278 F.3d at 1274.[8]

---

[8] The Supreme Court indicated in <u>TrafFix</u> that a Court need not speculate about
other design possibilities if a court otherwise finds the trade dress to be
functional. <u>TrafFix</u>, 532 U.S. at 33-34. The Court of Appeals for the Second
Circuit has not addressed how, if at all, <u>TrafFix</u> affects the consideration
of alternative designs. District courts in the Circuit have considered

68. Kwik Lok introduced evidence and argued at trial that there are alternative bag closure designs that can perform the same function as Kwik Lok's bag closures. As Schutte points out, Kwik Lok does not have a competitor selling bag closures that work on the 872 machine. Rather, for purposes of this litigation, Kwik Lok developed designs that it argued did not infringe on its asserted trade dress. Cooper Woodring, an industrial designer, Tr. 518, developed alternative designs with the same width, thickness, and spacing as the Kwik Lok J-NRP Product Configuration to run on the 872 machine. Tr. 534-35.

69. The designs, known as the "Circles" and "Squiggles" designs appear below. KL424-25; KL426-27. The alternative designs were made by printing the shapes on a 3-D printer, a method that Kwik Lok often employs when testing a prototype. Tr. 472.

---

alternative designs as relevant evidence, acknowledging that nothing in TrafFix appears to prohibit considering design alternatives but that when functionality is apparent then "the existence of design alternatives cannot resurrect an otherwise functional feature." New Colt Holding, 312 F. Supp. 2d at 214. McCarthy concludes that considering alternative designs is not inconsistent with the Supreme Court's functionality test in TrafFix because the alternative designs merely provide another source of how a particular shape's features work in practice. McCarthy § 7:75 ("I think that, as a matter of policy, consideration of alternatives can assist expert witnesses (and judges) in reaching a sound opinion (or decision) as to why a shape is or is not 'functional' under the Inwood test.")



Circles          Squiggles

70. The alternative designs were made from a plastic known as
    ABS, Acrylonitrile-butadiene-styrene. Tr. 197. Kwik Lok's
    closures are generally made from high-impact polystyrene,
    known as HIPS material. Tr. 198. ABS is more brittle than HIPS
    material, and HIPS material tends to have more tensile
    strength and is better able to absorb forces. Tr. 198.

71. To be probative of non-functionality, "alternative designs
    must be practical, feasible and effective." McCarthy § 7:75.
    "The existence of actual or potential designs that work
    equally well strongly suggests that the particular design
    . . . is not needed by competitors to effectively compete[.]"
    Valu Eng'g, 278 F.3d at 1276 (internal citation omitted). The
    relevance of any alternative designs is therefore contingent
    upon a demonstration that those designs can perform the
    function of the J-NRP design equally well as that design. See,
    e.g., New Colt Holding, 312 F. Supp. 2d at 214 ("Accordingly,
    for design alternatives to be probative, Plaintiffs must

produce evidence that could demonstrate that the alternative design would be equally effective as a functional matter.").

72. The evidence adduced by Kwik Lok with respect to the alternative designs does not support a factual finding that the Squiggles and Circles designs are feasible alternatives to the J-NRP closure. The alternative designs were created for the purpose of this litigation and as outlined below, are not comparable to the Kwik Lok J-NRP closure in several ways. Tr. 555.  The alternative designs do not demonstrate that there are practical alternatives to the J-NRP Product Configuration and the design in the '043 Registration; the alternatives only invite speculation about design possibilities. See Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co., 349 F.3d 601, 603 (9th Cir. 2003).

73. The Woodring designs were printed on a 3-D printer and were not manufactured out of the same plastic that would be used in the marketplace for the bag closures. Woodring acknowledged that the material used is "inferior" to the HIPS plastic used in production versions of the J-NRP and reasoned that the closures would "only run better in the proper material." Tr. 552. An important inquiry in the functionality analysis is whether particular features of the asserted trade dress affect the cost or the quality of the article. In this case, there is no way of knowing whether the intricate designs of the

Squiggle and Circles closures would increase the cost and diminish the quality of mass-produced closures if the closures were produced by extruding HIPS plastic which is the material used for the mass-produced J-NRP closures.

74. Dr. Koch testified for example that the more complex a shape is the more complex the stamping die would be. Tr. 188. The complex stamping process would potentially make it harder and more expensive to produce the alternative designs. Tr. 189. The additional cutouts in the Squiggles and Circles designs would also create an opportunity for the lok track mechanism to malfunction. For example, the registration finger which holds the closure in place might catch on the additional cutout portions of the Circles design. Tr. 190. With respect to the Squiggles design, the irregular corners of the designs are susceptible to snagging and breaking in the lok track and at the time when a customer removes and reuses the closure. Tr. 191.

75. Moreover, the testing of the alternative designs revealed serious deficiencies with the designs. In one round of testing at Kwik Lok's headquarters, some of the closures failed to attach to the bag. Some of the closures appear not to have separated from the other closures as the closures passed through the lok track and were placed onto a bag. KL410.  Some of the closures did not fully close the bag. Tr. 506. Other

closures prematurely broke off before the bag was fully
inserted. Tr. 508.  The control group of J-NRP closures made
of the same 3-D printed material did not experience any of
these problems. Tr. 508-09.

76. Woodring also tested the closures by running a strip of the
alternative closures through the 872 machine, and then running
the strip through the lok track with actual bags of bread
moving along a conveyer belt. Tr. 544. One of the tests ran
three bags of bread right after the other to test whether the
closures successfully closed each bag. Tr. 545. Woodring
testified and videos shown at trial showed that these tests
were largely successful. The alternative design closures
successfully attached to the three bags of bread and closed
the bags. KL413.

77. However, the tests run on the alternative designs are not
indicative of how the closures would work on a mass scale. The
872 bag closure machine frequently applies in excess of 6,600
closures per hour and runs for many hours a day, and most of
the bag closures must be handled by a fully automatic bag-
closing machine. SB13 (110 closures applied per minute); Tr.
32. When Kwik Lok is testing its own prospective bag closures
for whether they are viable for the market, it tests at least
4,000 closures and creates the closures from HIPS plastic. Tr.
495-98. Schutte tests approximately 100,000 closures on

automatic bag closing machines over several weeks before it allows its closures into the market. Tr. 72. The longest test that Kwik Lok performed on either of the suggested alternative designs was on three consecutive closures. Tr. 551. Woodring testified that no more than three consecutive closures were tested because "if one works and two works and three works, you can assume that more would work." Tr. 551-52. If that were true, there would be no reason for the far more extensive tests that both Kwik Lok and Schutte use to test their closures before using them commercially. The tests run on the alternative designs are unpersuasive evidence of the feasibility of an alternative design.

78. Because the alternative designs are purely hypothetical designs, are not made of the same material as the Kwik Lok closures, and were not tested on a mass production scale, Kwik Lok has failed to demonstrate that its hypothetical designs are viable alternatives for use in automatic bag closing machines such as the 872 machine.

**(3)**

79. The third Morton Norwich factor considers whether a seller has advertised the utilitarian advantages of a particular feature. Valu Eng'g, 278 F.3d at 1274. If so, the advertisement constitutes strong evidence of functionality.

See, e.g., In re Becton, Dickinson and Co., 675 F.3d 1368,
1375-76 (Fed. Cir. 2012); McCarthy § 7:74. "It is not
necessary that the advertising explicitly point to the utility
of the claimed trade dress feature. It is sufficient if the
utilitarian advantages of the feature are implicit in the
advertising." McCarthy § 7:74 (citing Disc Golf Ass'n, Inc. v
Champion Discs, Inc., 158 F.3d 1002, 1009 (9th Cir. 1998)
(finding functionality where "the functional value of the
. . . design is implicit in the advertising")).

80. The parties dispute the extent to which Kwik Lok advertised
the utilitarian advantages of its asserted trade dress
features. Kwik Lok claims that it simply advertised the
simplicity and ease of use of the Kwik Lok closure over
alternatives like wire ties or tape.

81. Schutte demonstrated persuasively that Kwik Lok has long
advertised its bag closure design as functional, even using
that exact terminology. For example, Kwik Lok made the
following claim about its bag closures in its promotional
materials:  "Kwik Lok is a better bag closure because the
closure is simple and uniquely suited to its function." SB19.
Kwik Lok further expanded on the value of the simple square-
based shape it chose for its bag closure design: "The
simplicity and unique design of the Kwik Lok closure minimizes
the mechanical design requirements of our bag closing

equipment. . . . Mechanical simplicity coupled with the closure's design work together to produce higher operating speeds." SB19. Kwik Lok admitted at trial that its advertisements stated that its closure's design contributes to their customers' desired goals of higher speeds and minimizing downtime, maintenance costs, repair bills, and crippled packages. Tr. 316-17.

82. Kwik Lok has further advertised that the J-NRP closure, in its current form, "remains unmatched in its simple form and its ability to close bagged packages." SB101 at KL0009108; Tr. 310-11. Kwik Lok has similarly claimed that its bag closures "[c]lose a bag as efficiently and cheaply as possible." SB101 at KL0009108; Tr. 311.

83. Kwik Lok has also specifically advertised the role that the "uniquely simple" design of the J-NRP closure contributes to a "bag closing machine with few moving parts and simple mechanical motions." SB164 at KL0002876. The bag closing machine referenced in this advertisement is the 872 machine. Tr. 313. Kwik Lok advertised that the simple design of the J-NRP closure allows Kwik Lok to make a machine that "reduces operating costs" through "less downtime," "less maintenance," "higher production speeds," and "fewer repair bills." SB164 at KL0002876.

84. Although Kwik Lok contends that its advertisements were only intended to compare its closures to wire ties, this distinction draws too fine a line. The Court need not ignore that the advertising touted the functional features of the Kwik Lok closures even if Kwik Lok's advertising was intended to tout those features relative to other non-plastic closing methods. See Talking Rain Beverage, 349 F.3d at 604.

85. Because Kwik Lok has promoted the utilitarian advantages of its claimed trade dress configurations, this factor argues in favor of functionality. See, e.g., Telebrands Corp., 814 F. Supp. 2d at 297.

**(4)**

86. The final factor to consider under the Morton-Norwich analysis is whether "the design results in a comparatively simple or cheap method of manufacturing the product." Valu Eng'g, 278 F.3d at 1274. This factor intersects with the question of whether the design "affects the cost . . . of the product." Qualitex, 514 U.S. at 165.

87. According to Schutte, a shape that deviates from the fundamentally square shape of Kwik Lok's J-NRP Product Configuration would require different tools to stamp the closure and any leftover plastic would have to be discarded or recycled at the expense of the manufacturer. Kwik Lok responds

that recycling the scraps would actually make production more
economical and any additional cost in manufacturing would be
insignificant over the lifespan of the tools. Tr. 474-76; Tr.
559-61.

88. The evidence relating to the cost of manufacturing the J-NRP
Product Configuration does not indicate that it would be
significantly less expensive than the hypothetical alternative
designs proposed by Kwik Lok. However, as discussed above, the
simple design of the J-NPR Product Configuration produces a
closure that is designed to work efficiently in a bag closing
machine, allowing machines to work at high speeds, and
minimizing customer costs from downtime, maintenance, repairs,
and crippled packages—attributes that Kwik Lok touted in its
advertising.

89. On balance, the Morton-Norwich factors support the conclusion
that the trade dress in the '043 Registration and the J-NRP
Product Configuration are functional. This is also the
conclusion reached under the TrafFix analysis because the
trade dress affects the cost and quality of the bag closure.
The design of the asserted trade dress is essentially a simple
square accompanied with an opening through which the bag is
closed. Not only is this design basic and non-ornamental, it
is also the most useful shape for the functions served by the
bag closure because it contains the most material and

therefore is the strongest shape for a closure of that size that is designed to be mechanically attached and constantly manipulated by the end use consumer. The functionality of the closure has been acknowledged by Kwik Lok in expired utility patents and in promotional materials that acknowledge the utilitarian advantages of the trade dress it seeks to protect. Finally, the complete absence of competitors who sell alternatives to work in the same machines as the J-NRP design is powerful evidence of the functionality of the design. For all of these reasons, Kwik Lok's claimed trade dress configurations are functional and therefore unprotectable. The '043 Registration should be canceled because the mark in that registration is functional.

**D.**

90. Because the trade dress covered by the '043 Registration and the J-NRP Product Configuration is functional, it is not entitled to trade dress protection. That conclusion is sufficient to dispose of the claims and counterclaims relating to alleged trade dress infringement. Nevertheless, for purposes of completeness, the Court will consider whether there is a likelihood of confusion between Schutte's Clipps G products and the Kwik Lok J-NRP closure. There is not. As part of its claim for trademark infringement, it is Kwik Lok's

burden to show that Schutte's products are likely to confuse consumers about their source or sponsorship. Nora Beverages, 269 F.3d at 118-19.

91. "Likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible." Estee Lauder, Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997) (internal quotation marks and citation omitted); Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993).

92. Critical to such an analysis are the eight factors set out in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). Those factors are:

> (1)   strength of the plaintiff's trade dress;
> (2)   similarity of the trade dresses;
> (3)   proximity of the products in the marketplace;
> (4)   likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which the defendant sells its product);
> (5)   evidence of actual confusion;
> (6)   the defendant's bad faith;
> (7)   quality of the defendant's product; and
> (8)   sophistication of the relevant consumer group.

Nat. Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578 (2d Cir. 2005) (internal quotation marks and citation omitted).

93. The Court's task is to weigh these enumerated factors with an eye to the ultimate question: whether, taken as a whole, there is a likelihood of consumer confusion with respect to the

protected product and the product charged with unlawful infringement. See, e.g., Nora Beverages, 269 F.3d at 119; Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 400 (2d Cir. 1995). ("[I]t is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why.")

**(1)**

94. Several factors are not truly disputed in this case: (1) There is no evidence of actual confusion because the parties did not conduct consumer surveys. Lack of actual confusion, however, is not dispositive. Only a likelihood of confusion is required. See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986). This factor is neutral. (2) There is no evidence that Schutte's products are inferior to Kwik Lok's products. Kwik Lok introduced evidence that it employs quality control procedures and inspections but introduced no evidence that Schutte's products are inferior. Tr. 300-02. Accordingly, this factor is resolved in Schutte's favor. See Malaco Leaf, 287 F. Supp. 2d at 377 (resolving the factor in the defendant's favor where the mark holder had not submitted any evidence concerning consumers' perceptions of a quality differential between the products). (3) The "bridge the gap" factor does not apply in

this case because Schutte and Kwik Lok operate in the same market and there is no gap to bridge. See Keystone Mfg. Co. v. Jaccard Corp., 394 F. Supp. 2d 543, 558 (W.D.N.Y. 2005). Accordingly, the likelihood of confusion analysis turns on the weight accorded to the other factors. See Arrow Fastener, 59 F.3d at 400.

**(2)**

95. With respect to the strength of the trade dress, "[w]hen determining whether either a suggestive or descriptive mark is a strong one for purposes of the Polaroid inquiry, we look to the secondary meaning that the mark has acquired, because the ultimate issue to be decided is the mark's origin-indicating quality in the eyes of the purchasing public." The Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 961 (2d Cir. 1996). The incontestability of a mark is relevant to deciding whether a mark is strong under the Polaroid test. Id.; Savin Corp. v. The Savin Grp., 391 F.3d 439, 457 (2d Cir. 2004); Arrow Fastener, 59 F.3d at 391 ("A court's inquiry regarding the strength of a mark often parallels the inquiry concerning the mark's validity, inasmuch as the strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded." (internal quotation marks and

citation omitted)). "[I]ndependent indicia of strength"
separate from the mark's registration are also relevant to
deciding whether a mark is strong under <u>Polaroid</u>. <u>Sports
Auth.</u>, 89 F.3d at 961.

96. Kwik Lok argued in its post-trial submission that the
incontestability of the '043 Registration answers the question
of whether the '043 Product Configuration and the J-NRP
Product Configuration are strong marks. However, Kwik Lok
conflates the prima facie distinctiveness of a mark registered
for more than five years which is presumed to have acquired
secondary meaning with the strength of the mark under
<u>Polaroid</u>. <u>See</u> <u>id.</u>; McCarthy § 11:82 ("The fact that a
trademark is the subject of a federal registration that has
ripened into incontestable status should not dictate the
conclusion that the mark is 'strong' with no further analysis.
Even though secondary meaning is conclusively presumed for a
mark with an incontestable registration, that does not
automatically transfer into a conclusive presumption of
strength in a likelihood of confusion analysis." (internal
quotation marks and citation omitted)).

97. The inquiry into whether a mark is strong for purposes of the
likelihood of confusion analysis considers the number of
similar marks in the same class, the length of time of the
mark's use, the promotional activities taken in support of the

mark, volume of sales, and secondary meaning. See W.W.W.
Pharm. Co. Inc. v. Gillette Co., 984 F.2d 567, 572-73 (2d Cir.
1992), limited on other grounds by Deere & Co. v. MTD Prods.,
Inc., 41 F.3d 39, 46 (2d Cir. 1994). "Importantly, a mark's
strength is examined principally in the market in which the
mark is used. Hence defining that relevant market becomes an
important aspect of the infringement analysis." The
Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C., 182
F.3d 133, 139 (2d Cir. 1999)

98. Kwik Lok has been using the '043 Product Configuration and J-
NRP Product Configuration for over 50 and 20 years,
respectively. KL820; Tr. 276. During this time, Kwik Lok
expended significant financial and other resources to market,
advertise, and promote its bag closure products embodying the
J-NRP Product Configuration in various brochures and catalogs.
Tr. 251.

99. Kwik Lok has advertised products embodying its J-NRP Product
Configuration in various trade publications such as the
Packer, Produce News and Onion World. Tr. 274-75; KL824. Since
2006, Kwik Lok has expended in excess of four and half million
dollars on marketing the J-NRP closure products. Tr. 251.

100. Kwik Lok also regularly markets and promotes its bag
closure products embodying the J-NRP Product Configuration at

various industry trade shows specifically targeted to its customers. Tr. 253-54; KL365.

101. From 1996 through 2013, sales of Kwik Lok bag closure products embodying the '043 Registration exceeded 5 billion units per year, and in 2014, Kwik Lok sales of J-NRP series closures were 6.2 billion units. Kwik Lok has sold at least 100,500,637,000 closures embodying the '043 Product Configuration for the year ending March 31, 1997 through the year ending March 31, 2013. KL337 and KL339 at KL0001244-1277.

102. This evidence sufficiently supports a finding that Kwik Lok's '043 Product Configuration, including the J-NRP Product Configuration, is a relatively strong mark in the bag closure market.

(3)

103. The next factor, similarity, is a fundamental factor in the likelihood of confusion analysis. See Frito-Lay v. Bachman Co., 704 F. Supp. 432, 435 (S.D.N.Y. 1989). Similarity attempts "to discern whether the similarity of the marks is likely to cause confusion among potential customers." Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) (internal quotation marks and citation omitted). "To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the

context in which the marks are displayed and the totality of
factors that could cause confusion among prospective
purchasers." Id. (internal quotation marks and citation
omitted).

104. There is little doubt that the J-NRP and '043 Product
Configurations and the Clipps G products are substantially
similar. Although the Clipps G has a concave cutout on the
bottom side, the Clipps G shares the same general rectangular
shape as the J-NRP and other '043 Product Configurations.
Moreover, the Clipps G and the J-NRP closures have the same
funnel shaped opening at the top of the closure. The two
closures also have corners that are not squared.

105. However, no evidence was presented at trial that the Clipps
G and the J-NRP closures are sold side-by-side or are intended
to be sold side-by-side. "[T]he Lanham Act requires a court to
analyze the similarity of the products in light of the way in
which the marks are actually displayed in their purchasing
context." Id. at 538. "In judging similarity, courts are to
consider all factors that could reasonably be expected to be
perceived by and remembered by potential purchasers. That
includes the context in which the respective marks are
generally presented." Arrow Fastener, 59 F.3d at 394 (internal
quotation marks and citation omitted). The Court must consider
the context in which ordinary buyers of closures would see the

conflicting marks in the marketplace and make their choices. McCarthy § 23:58. This is not, for example, a case where a junior user's name appears next to the senior trademark user's registered logo. See Guthrie Healthcare Sys. v. ContextMedia, Inc., No. 14-3343-CV(L), 2016 WL 3245039, at *8 (2d Cir. June 13, 2016).

106. Schutte argues that there is no likelihood of confusion because Kwik Lok and Schutte products are labeled with their respective logos. In product configuration cases, such as this one, the most important facts are the packaging, marketing, and labeling of the similarly configured products. Ann Howard Designs, L.P. v. Southern Frills, Inc., 992 F. Supp. 688, 692 n.14 (S.D.N.Y. 1998) (quoting Versa Prods. Co. v. Bifold Co. (Mfg.), 50 F.3d 189, 212 (3d Cir. 1995)); accord Nora Beverages, 269 F.3d at 122 (noting that "[l]abels can be integral, if not dispositive, factors in determining overall similarity of trade dress"). If the allegedly confusing similarity involves the design of the products themselves, there can be no likelihood of mistaken purchases if the appearance of those products plays no role in the purchasing process. Versa Prods., 50 F.3d. at 213.

107. Kwik Lok argues that the use of the parties' "respective house marks" or self-identifying labels does not dispel the likelihood of confusion and could in fact, aggravate confusion

because consumers are likely to believe that the Schutte products are licensed or associated with Kwik Lok, citing Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 406 (2d Cir. 2004) and A. T. Cross Co. v. Jonathan Bradley Pens, Inc., 470 F.2d 689, 692 (2d Cir. 1972). Indeed, the Court of Appeals for the Second Circuit noted in International Information Systems that "consumer confusion is plainly not limited to source confusion" and that the use of a registered trademark term could confuse customers into believing that the trademark holder had endorsed the alleged infringer's product. 2016 WL 2893172, at *7.

108. The cases Kwik Lok cites in support of the proposition that a house mark might actually obscure the source of a product and trick customers into thinking the alleged infringer is associated with the infringed party's mark are distinguishable. Neither Register nor A.T. Cross was a product configuration case, and in both cases, there was additional evidence of the defendants' attempts to mislead consumers into thinking that their products were the real things. In Register.com, the defendant web design company solicited the customers of the plaintiff internet domain registry services by identifying the web design company by name while also mentioning the customers' recent domain registry. 356 F.3d at 406. And in A.T. Cross, there was a likelihood that the

defendant seller of pens and mechanical pencils infringed the trademark "Crosse" for pens. 470 F.2d at 692.

109. Moreover, the Court must consider in this case the "total effect" of the fact that Schutte is not using the closure shape standing alone and that whatever closure it markets appears with Schutte's own logo and packaging. See <u>Arrow Fastener</u>, 59 F.3d at 395. The relevant question is whether the proper designation of the source of goods—Kwik Lok or Schutte— mitigates the likelihood of confusion and whether a consumer would be tricked into thinking that the Clipps G closures are produced, endorsed, or sponsored by Kwik Lok.

110. Kwik Lok bag closures are distributed in cartons, identifiable by the red Kwik Lok logo and the words "Kwik Lok" on the outside of the carton. SB136. Schutte's proposed promotional materials bear logos that are very different from the Kwik Lok logos. <u>Compare</u> Clipps by Schutte Bagclosures SB121; KL545, KL640 <u>with</u> Kwik Lok logo SB136, KL332, KL333.

  

111. The presence of the Schutte and Kwik Lok logos sufficiently dispels the likelihood of purchaser confusion between the Schutte Clipps G and the Kwik Lok J-NRP and '043 Product Configurations. The only evidence Kwik Lok offered that purchasers would be confused was the testimony of Miksanek who said he thought that operators would be confused. Tr. 391. Miksanek's testimony does not support a likelihood of confusion by consumers for several reasons. Miksanek testified about the physical similarity of the two competing closures as they appeared to an operator. But machine operators are not the purchasers of the products. Miksanek did not testify about how the products were sold to the actual purchasers of the products. Miksanek's testimony does not support the notion that consumers will be confused by the *labeling* of the promotional materials, the boxes, or the packaging.

112. Kwik Lok argues that there is a likelihood of post-sale confusion, but the cases focusing on post-sale confusion relate to products that are used and marketed to general consumers. In <u>Lois Sportswear</u>, the Court of Appeals noted that "post-sale confusion would involve consumers seeing appellant's jeans outside of the retail store, perhaps being worn by a passer-by. The confusion the [Lanham] Act seeks to prevent in this context is that a consumer seeing the familiar stitching pattern will associate the jeans with appellee and

that association will influence his buying decisions." <u>See</u>
799 F.2d at 872-73. Kwik Lok offers the testimony of Miksanek
as evidence of post-sale confusion. Tr. 391-92. This testimony
is not persuasive or relevant because Miksanek could only
speculate as to what an operator would think upon seeing a
Schutte closure, and did not provide any basis for his
opinion. The parties did not provide any consumer surveys
showing confusion. Moreover, there is no evidence in this case
that the purported post-sale observers, either operators or
people buying bread at a store, are target closure consumers,
a highly specialized market. Even if there is post-sale
confusion, the post-sale confusion in the context of plastic
bag closures is not the type of confusion that the Lanham Act
would seek to prevent. <u>See</u> <u>Lois Sportswear</u>, 799 F.2d at 872-
73; <u>Landscape Forms</u>, 113 F.3d at 382-83 ("[S]uch third parties
are only relevant if their views are somehow related to the
goodwill of the aggrieved manufacturer.").

113. Moreover, Schutte markets the Clipps G products in the
United States as an alternative to Kwik Lok's bag closures
products (including the J-NRP) and the advertising
specifically points out which Schutte products may be
substituted for each of Kwik Lok's products while boldly
proclaiming "Finally you have a choice!" SB182 (promotional
box); <u>see also</u> KL658 at SCHUTTE/KWIK LOK 1236 ("We offer you a

choice!"). Schutte promotes itself as an alternative to, not as a licensee of, Kwik Lok. The promotional box is very literal in underscoring the Schutte choice—butterfly-like closures are depicted flying from Europe to the United States. SB182. See <u>Dorr-Oliver, Inc. v. Fluid-Quip, Inc.</u>, 94 F.3d 376, 383 (7th Cir. 1996) ("We believe that, in the context of this industrial machine, the typical consumer will not assume that the two manufacturers are associated in some way. Rather, where product configurations are at issue, consumers are generally more likely to think that a competitor has entered the market with a similar product.").

114. Therefore, although the closures are physically similar, the labeling and packaging in which the closures are promoted and sold reduce the likelihood of confusion. See <u>Landscape Forms</u>, 113 F.3d at 382; <u>Arrow Fastener</u>, 59 F.3d at 395; <u>Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.</u>, 973 F.2d 1033, 1046 (2d Cir. 1992).

115. Moreover, Schutte demonstrated persuasively that the channels of distribution further reduce the likelihood of consumer confusion because the closures are sold to wholesale distributors and because the end users, primarily large to mid-size bakeries, are sophisticated consumers.

**(4)**

116. The proximity of services factor "concerns whether and to
     what extent the two products compete with each other and the
     nature of the products themselves and the structure of the
     relevant market." <u>Morningside Group Ltd.</u>, 182 F.3d at 140
     (internal quotations and citations omitted).

117. The products offered by Kwik Lok and Schutte are directly
     competitive because the two companies offer the same product:
     automatically applied plastic bag closures. Kwik Lok markets
     its bag closure products to the baking and snack industry, the
     meat and poultry industry, the ice industry, and to the fruit
     and produce industry. KL3 at KL0008133; Tr. 253, 297. And
     there is no dispute that the intended market for Schutte's
     Clipps G products are bakeries, produce packers, and the food
     industry, and therefore, the parties' products are directly
     competitive with one another in the same market. <u>See</u>
     <u>Morningside Group Ltd.</u>, 182 F.3d at 140; KL571; KL19 at
     KL0001070 (showing that the Clipps G can be used with most
     plastic bags to pack bread, produce and other food products);
     Tr. 47.

118. With respect to the structure of the market, Kwik Lok does
     not sell any equipment, nor any of its bag closures for
     individual use. Paxton Dep. Vol. I at 111:9-17. "Goods

purchased directly from the producer are less subject to
confusion than goods purchased from retail stores which carry
the goods of more than one producer." 3A Callmann on Unfair
Comp., Tr. & Mono. (4th ed.) § 21:94.

119. Kwik Lok's products are sold through almost 200 independent
distributors in the United States, and these sales account for
80% of Kwik Lok's sales. Tr. 298-99. The distributors hold
their own inventory of Kwik Lok products and sell the products
directly to customers. Tr. 299. The distributors are non-
exclusive and could potentially sell other third-party bag
closures side-by-side. Tr. 299.

120. The wholesale bakeries that are the main purchasers of bag
closures do not buy the closures at a retail establishment
where the parties' products would be next to each other on the
shelf without outer packaging. Tr. 48. Instead, these
professional buyers buy vast quantities of the closures
directly from the manufacturers themselves or their authorized
distributors. Tr. 48-49. Based on Schutte's representations,
its anticipated distributors would not handle Kwik Lok's
products, further minimizing any mistaken ordering or
delivery. Tr. 47-48. In sum, although Kwik Lok alleges that
the appearance of the parties' products is confusingly
similar, the appearance of the products simply does not factor
into the purchasing process. At every step of that process,

purchasers who buy bag closures from Schutte will be fully aware that they are buying closures from Schutte rather than Kwik Lok. Tr. 48.

121. Although Schutte has not yet sold its products in the United States, KL830, this Court can credit Schutte's representations in considering how Schutte's products would be distributed and presented in the marketplace. See Arrow Fastener, 59 F.3d at 395. Schutte marketed and sent samples to certain bakeries in the United States. KL830. Schutte has not yet entered into any contract for the purchase or supply of bag closures and does not have distributors in the United States.  Tr. 55-56. Schutte represented at trial that it would not work with distributors that work with Kwik Lok. Tr. 48. Kwik Lok did not present any evidence to the contrary that would indicate there is a real risk of Schutte and Kwik Lok products being sold by the same distributors.

122. This Court also credits the unrebutted evidence that Schutte contacted bakeries and asked them whether they would be interested in purchasing an "alternative product." Tr. 581; KL503; KL628 at 1079T. The offered product was clearly marked with the "Clipps" mark that was noted as registered by "Schutte Bagclosures" and mentioned that "Clipps . . . are coming to the U.S." KL640.

123. Therefore, the structure of the market where the products
are to be sold cuts against a finding of confusion.

                                (5)

124. The sophistication of the purchasers of Kwik Lok and
Schutte products further underscores the low risk of
confusion. "[T]he more sophisticated and careful the average
consumer of a product is, the less likely it is that
similarities in trade dress or trademarks will result in
confusion concerning the source or sponsorship of the
product." Bristol-Myers Squibb, 973 F.2d at 1046.

125. Miksanek, one of Kwik Lok's former distributors, explained
the different types of Kwik Lok product purchasers: 25 percent
of the customers are small, family-owned companies, 50 percent
of Kwik Lok's customers are medium size companies, and 25
percent of Kwik Lok's customers are large companies. Tr. 382.

126. In large bakeries, purchasing agents meet with distributors
to discuss the type of closures that are available. Tr. 377.
In medium-sized bakeries, owners or plant managers meet with
distributors, and discuss the possible options with machine
operators. 377-78. Smaller bakeries tend not to have automated
bag closing machines although they might use semi-automated
machines. Tr. 383. But even at smaller customers, a
distributor would meet with clients, generally the owners, to

discuss their bag closing needs. Tr. 378. The customers are
not purchasing closures on a whim or without discussion.
Although Miksanek also testified that an operator would be
confused looking at a Clipps G and think it came from Kwik
Lok, the foundation for such testimony is unclear, and the
operator is not the person making the purchasing decision. Tr.
391.

127. The end user purchasers of closures do not buy a single
closure. A single Schutte closure reel contains 5,000 Clipps
G, and a Kwik Lok reel contains 4,000 closures. Tr. 48. Each
Schutte box contains 10 reels, and each Kwik Lok box contains
15 reels. Tr. 48-49. The minimum purchase order of Schutte
closures is 50,000 closures, and a Kwik Lok box would contain
about 60,000 closures. In some cases, a distributor may sell
single Kwik Lok 4,000 closure reel. Tr. 263. However, the
closures are not sold individually. Tr. 263. Even in bakeries
without an automatic bag closing machine, purchasers would buy
a box of 4,000 separated closures. Tr. 264.

128. Moreover, the purchasers of closures certainly would know
from whom they were buying and would not be confused in a case
such as this one involving product-design trade dress, where
there is a relatively small market of purchasers in the United
States, a sale of products is preceded by negotiations either
with distributors or company representatives, there are only

two sellers, and the products are shipped in packaging conspicuously marked with the parties' names. See Dorr-Oliver, Inc., 94 F.3d at 382-83; Henegan Constr. Co, Inc. v. Heneghan Contracting Corp., No. 00-cv-9077 (JGK), 2002 WL 1300252, at *8 (S.D.N.Y. June 12, 2002) ("In this case, the plaintiff's potential consumers are highly sophisticated businesses that typically go through extensive bidding procedures before awarding contracts, and there is almost no chance that any confusion between the plaintiff and the defendant would ever go unremedied to the point of sale.").

129. Considering the level of sophistication of the purchasers and the circumstances through which these products are bought in bulk directly from exclusive sources, there is no realistic probability of mistaken purchases. See, e.g., Arrow Fastener, 59 F.3d at 399; Versa Prods., 50 F.3d at 213 ("The appearance of these valves simply plays no role in the ordering process, which instead requires the use of detailed technical specifications and lengthy, manufacturer-specific part numbers. Under these circumstances, we find it utterly inconceivable that one of—let alone an appreciable number of—the professional buyers of these valves will be confused.").

130. The likelihood of confusion is very low given the high level of sophistication among the buyers of closures, because the closures are purchased on a wholesale basis, and because

the closures are clearly packaged and labeled with the parties' respective logos. See Spotless Enters., 294 F. Supp. 2d at 353. Accordingly, the factors of proximity, sophistication, and similarity cut against a likelihood of confusion.

**(6)**

131. The final factor to consider, bad faith, analyzes "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991) (internal citations omitted). The "appropriate 'intent' to focus on is not the intent to *copy* but rather the intent to *deceive* or *confuse*." Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc., 730 F.3d 494, 514-15 (6th Cir. 2013) (finding no bad faith where the defendant copied functional elements of plaintiff's trade dress and "targeted consumers who are familiar with the [plaintiff's product] and offered them a competitive option"); Landscape Forms, 113 F.3d at 383 (concluding the district court erred in giving too much weight to the defendant's awareness of the plaintiff's trade dress because "simulating the design of a competitor's successful

products is not bad faith, unless there is reason to draw an inference of an intention to deceive").

132. Kwik Lok argued at trial that Schutte adopted the Clipps G Product in bad faith because Schutte knowingly copied or used Kwik Lok's trade dress. Kwik Lok pointed to an October 3, 2013 memo that stated: "For 25 years, Schutte has been in market with 'a copy' of the Kwik Lok closure. Smartly done, and just a little bit different form Kwiklok." KL650 at Schutte/Kwik Lok 488T. This is the only evidence that Kwik Lok provided of Schutte's alleged bad faith. But the memo only demonstrates copying, it does not show that the copying was done with an intent to deceive customers.

133. Schutte does not dispute that it was aware of Kwik Lok's claimed trade dress. Indeed, its proposed marketing campaign in the United States attempts to give prospective purchasers an alternative to Kwik Lok products. Schutte pointed out that it succeeded in European litigation over Schutte's alleged infringement of Kwik Lok's European trademark. After prevailing in the European Litigation, Schutte believed that it could manufacture closures that were identical to Kwik Lok's '043 Registration and J-NRP Product Configuration. Tr. 29-30. In an effort to avoid confusion, Schutte changed the name of the closure from SchutLok to Clipps G. Tr. 44-45. Schutte wanted to create a new design, a new "closure that

would be better and that would be as different as possible to the trademark of Kwik Lok." Tr. 45; KL650 at 492T. There is no evidence of bad faith or that Schutte sought to exploit similarities to Kwik Lok's J-NRP Product Configuration to deceive consumers into purchasing its product. Accordingly, this factor cuts against a likelihood of confusion.

134. The applicable <u>Polaroid</u> factors dictate the conclusion that there is no likelihood of consumer confusion. Schutte's actions in marketing its products in the United States, the channels of distribution of closures in the marketplace, and the sophistication of closure purchasers all underscore that Schutte is not attempting to confuse potential purchasers and there is no likelihood of confusion. Of the more critical <u>Polaroid</u> factors of strength, similarity, and proximity, the latter two weigh in Schutte's favor with customer sophistication and bad faith also cutting decisively against a likelihood of confusion.

135. Therefore, Schutte is entitled to a declaration of non-infringement on the basis that Kwik Lok's '043 Registration and J-NRP Product Configuration is functional and therefore non-protectable, and in the alternative, Schutte is also entitled to a declaration of non-infringement because there is no likelihood of confusion between the Clipps G closures and the closures covered by Kwik Lok's '043 Registration and J-NRP

Product Configuration. Therefore, Kwik Lok's claims against
Schutte for trade dress infringement and trade dress unfair
competition are dismissed.

**E.**

136. Schutte's second claim for relief is for a declaration of
non-dilution under the Federal Trademark Dilution Act, 15
U.S.C. § 1125(c), and New York law, N.Y. Gen. Bus. Law § 360-
l. The analysis below addresses Schutte's claim for
declaratory relief and Kwik Lok's overlapping counterclaim
under the Federal Trademark Dilution Act and New York law.

**(1)**

137. To recover for trademark dilution claim under 15 U.S.C.
§ 1125(c), Kwik Lok must show that: (1) its mark is famous and
distinctive; (2) Schutte is making commercial use of the mark
in commerce; (3) Schutte's use began after Kwik Lok's mark
became famous; and (4) Schutte's use presents a likelihood of
dilution of the distinctive value of the mark. 15 U.S.C. §
1125(c)(1). Only trademarks that enjoy such broad renown so as
to at least approach (if not attain) the status of "household
names" may qualify as famous marks under federal law. See,
e.g., Friesland Brands, B.V. v. Vietnam Nat'l Milk Co., 228 F.
Supp. 2d 399, 412 (S.D.N.Y. 2002); see also Luv N' Care, Ltd.
v. Regent Baby Prods. Corp., 841 F. Supp. 2d 753, 757

(S.D.N.Y. 2012); <u>Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.</u>, 198 F. Supp. 2d 474, 486 (S.D.N.Y. 2002).

138. A trademark is famous for dilution purposes only "if it is widely recognized by the *general consuming public* of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added). In other words, "niche fame" among a specific marketplace or group of consumers is insufficient and the general public itself must associate the trademark at issue with the trademark owner. <u>See, e.g.</u>, <u>Luv N' Care</u>, 841 F. Supp. 2d at 757-58 (noting that "the inclusion in the [Trademark Dilution Revision Act] of the phrase 'widely recognized by the general consuming public of the United States' 'was intended to reject dilution claims based on niche fame, i.e. fame limited to a particular channel of trade, segment of industry or service, or geographic region.'") (quoting <u>Dan-Foam A/S v. Brand Named Beds, LLC</u>, 500 F. Supp. 2d 296, 307 n. 90 (S.D.N.Y. 2007)). Under federal law, a higher degree of distinctiveness is required for dilution protection than to show a protectable interest for trademark infringement. <u>George Nelson Found. v. Modernica, Inc.</u>, 12 F. Supp. 3d 635, 648 (S.D.N.Y. 2014)

139. There is no dispute in this case that Kwik Lok's customers
     are primarily the bakeries and other companies that buy its
     bag closures by the thousands for use in automatic bag closure
     machines. To the extent that Kwik Lok's claimed trade dress
     configurations have any degree of fame, it would be among this
     small segment of the population rather than the general
     consuming public of the United States. Kwik Lok's only
     evidence at trial of general fame was a local news story about
     a Washington-based high school teacher that collected a
     million Kwik Lok closures. Tr. 283:2-14. Kwik Lok does not put
     its name on its bag closures or in any way attempt to create
     an association between those bag closures and itself among the
     general consuming public. The general consuming public may
     very well be aware of the bag closures that Kwik Lok sells,
     but they have no reason to associate the closures with Kwik
     Lok rather than with one or more other unnamed companies or
     with the producers of the products that are contained in the
     bags on which the closures are used.

140. Kwik Lok also proffered Richard Miksanek's testimony that
     he knew Kwik Lok to have produced J-NRP closures and other
     closures for several decades. Tr. 388. Miksanek testified that
     he regarded the Kwik Lok closures as distinctive and believed
     that people would recognize the Kwik Lok logo. Tr. 388-89.
     Miksanek, however, provided no basis for his opinion as to

whether the *general public* knows about Kwik Lok as the source of the closures. Miksanek had no reliable basis to testify about the overall fame of Kwik Lok's bag closures outside of the niche market of bag closure whole sale purchasers and his testimony on this issue was unpersuasive.

141. As a result, Kwik Lok has failed to prove the requisite level of fame that is necessary to be entitled to relief under federal law for dilution. See, e.g., Boarding Sch. Review, LLC v. Delta Career Educ. Corp., No. 11-cv-8921 (DAB), 2013 WL 6670584, at *7 (S.D.N.Y. Mar. 29, 2013) (dismissing dilution claim where trademarks were only "recognized within the niche market of for-profit, post-secondary schools"); Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc., No. 12-cv-3599(RWS), 2012 WL 3240442, at *8 (S.D.N.Y. Aug. 7, 2012); Luv N' Care, 841 F. Supp. 2d at 759; Heller Inc. v. Design Within Reach, Inc., No. 09-cv-1909 (JGK), 2009 WL 2486054, at *4 (S.D.N.Y. Aug. 14, 2009) (dismissal for failure to allege that its trademarked Bellini Chair was famous beyond the "contemporary furniture niche of the population").

142. Therefore, Kwik Lok's federal dilution claim must be dismissed and Schutte is entitled to a declaration of non-dilution under the federal statute.

**(2)**

143. To succeed on a claim under New York General Business Law § 360-l for trademark dilution, a plaintiff must prove "(1) that it possess[es] a strong mark one which has a distinctive quality or has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the [plaintiff] that it identifies goods sold by that entity as distinguished from goods sold by others, and (2) a likelihood of dilution by either blurring or tarnishment." Biosafe-One, Inc. v. Hawks, 639 F. Supp. 2d 358, 367 (S.D.N.Y. 2009) (internal citation omitted), aff'd, 379 F. App'x 4 (2d Cir. 2010). Fame is not required under the statute, and an injunction can be obtained "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services." N.Y. Gen. Bus. Law § 360-l.

144. As discussed above, Kwik Lok cannot show that it owns a protectable trademark because the trade dress configurations it claims for the design of its bag closures are functional. Moreover, as detailed above, where the parties sell to sophisticated purchasers like the industry professionals in this case, dilution is unlikely because those purchasers will recognize that the parties' products come from two different

sources. See, e.g., Landscape Forms, Inc. v. Columbia Cascade Co., 117 F. Supp. 2d 360, 370 (S.D.N.Y. 2000) (noting that the dilution test under state law is similar to the Polaroid test for likelihood of confusion). Therefore, Kwik Lok has no claim under New York General Business Law § 360-l.

145. To the extent that Kwik Lok had a claim under Section 360-l, it would be preempted under federal patent law. In Bonito Boats, the Supreme Court explained that "state regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws." Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 152 (1989). More particularly, "publicly known design and utilitarian ideas which were unprotected by the patent laws" occupied much the same place as expired patents. Id. The states may, however, "place some conditions on the use of trade dress"; in particular the states may place limited regulations on the use of important designs "in order to prevent consumer confusion as to source." Id. at 154, 165. New York General Business Law § 360-l, however, goes beyond a statute that protects against consumer confusion and would authorize an injunction without such a showing. See N.Y. Gen. Bus. Law § 360-l (allowing liability "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.").

146. Whether or not Kwik Lok concedes that the trade dress that
it claims as part of this litigation has been the subject of a
utility or design patent, it cannot dispute that product
designs such as the bag closures at issue are "potentially
patentable" and therefore Kwik Lok's claims under New York
General Business Law § 360-l are preempted. See, e.g., Luv N'
Care, 841 F. Supp. 2d at 761 (holding that New York anti-
dilution law is preempted with respect to claims concerning
the shape of baby products); E. Am. Trio Prods., Inc. v. Tang
Elec. Corp., 97 F. Supp. 2d 395, 424 n.199 (S.D.N.Y. 2000)
("To the extent that New York's antidilution statute is
designed to prevent defendants from making, using, or selling
phone designs that allegedly mimic [plaintiff's] design, it
promotes the same goals as the federal patent scheme and must
yield to the national interest in uniform patent law."),
appeal dismissed, 243 F.3d 559 (Fed. Cir. 2000); Escada AG v.
The Limited, Inc., 810 F. Supp. 571, 573-74 (S.D.N.Y. 1993)
(holding that New York anti-dilution law is preempted with
respect to claims concerning the shape of bottle designs).
Kwik Lok is therefore not entitled to relief under this
statute. Kwik Lok's state law dilution claim is therefore
dismissed.

**F.**

147. Kwik Lok also asserts a claim for unfair competition under
New York state law. Kwik Lok argues that this claim survives
even if its claims for trademark infringement and trade
dilution fail. However, as Kwik Lok recognizes, the essence of
unfair competition under New York law is "bad faith
misappropriation of the labors and expenditures of another,
likely to cause confusion or to deceive purchasers as to the
origin of the goods." See Rosenfeld v. W.B. Saunders, 728 F.
Supp. 236, 249-250 (S.D.N.Y. 1990) (internal quotation marks
omitted); Friesland Brands, 228 F. Supp. 2d at 412.

148. As explained above, Schutte did not act in bad faith nor is
there a likelihood of confusion with respect to Kwik Lok's and
Schutte's closures. Accordingly, Kwik Lok's claim for unfair
competition under New York law must be dismissed.

**IV. CONCLUSION**

The Court has considered all of the arguments of the
parties. To the extent not specifically discussed above the
arguments are either moot or without merit. To the extent any
Finding of Fact is more appropriately a Conclusion of Law or any
Conclusion of Law is more appropriately a Finding of Fact, the
Finding or Conclusion should be construed as such.

For the foregoing reasons, Schutte is entitled to judgment (1) declaring that the importation, manufacturing, marketing, distribution, sale and commercial use of the Clipps G bag closure does not infringe or dilute any trademark or trade dress rights claimed by Kwik Lok; (2) ordering the cancellation of United States Trademark Registration number 1,972,043 on the grounds that the design claimed therein is functional and not a proper subject of registration; and (3) dismissing Kwik Lok's Counterclaims in their entirety. Schutte is directed to submit a proposed judgment by **June 27, 2016**. Kwik Lok may submit any responsive papers by **July 5, 2016**. The Clerk of Court is directed to close all open motions.


**Dated:**     **New York, New York**
          **June 14, 2016**


                              _____/s/_____

                                   **John G. Koeltl**
                            **United States District Judge**